**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| C.A., an individual; and C.B., an individual, | |
| *Plaintiffs,* | Civil Action No. _____ |
| v. | **JURY TRIAL DEMANDED** |
| COOPERSURGICAL, INC., | |
| *Defendant.* | June 23, 2025 |

## COMPLAINT

Plaintiffs C.A. and C.B. (collectively, "Plaintiffs") respectfully bring this Complaint against Defendant COOPERSURGICAL, INC. ("Cooper" or "Defendant"), and allege as follows:

## NATURE OF THE ACTION

1. Cooper's defective product and negligent conduct destroyed Plaintiffs' precious and irreplaceable embryos.

2. Cooper was on notice that its product was defective *before* it was used on Plaintiffs' embryos, but consciously decided not to advise Plaintiffs' fertility clinic until *after* its product ruined Plaintiffs' embryos. Punitive damages are particularly appropriate in this matter to prevent Cooper from harming others in the future.

3. Cooper manufactured, marketed, promoted, distributed, and sold media to be used for culturing and developing human embryos. Cooper marketed that its media provided "an optimized in vitro environment," which is necessary to ensure that fertilized human eggs can survive and develop into embryos viable for implantation.

1

4. Cooper further represented that it properly and adequately tested its embryo culture media before making the media available to the public, including to clinics that would use such embryo culture media for the storage of human embryos. Cooper further claimed: "Our world class ISO 13485 and ISO 9001 certified manufacturing site consistently maintains the highest standards for product quality and reliability."

5. Despite these representations, Cooper did not sufficiently manufacture or test the embryo culture media that it manufactured, marketed, promoted, distributed, and sold. As a result, it sold defective lots of embryo culture media, which turned out to seriously harm human embryos, eggs, and/or sperm.

6. Cooper's manufacturing, marketing, promoting, distributing, and/or selling its defective culture media resulted in the death of Plaintiffs' embryos.

7. Only after Plaintiffs' embryos died upon coming into contact with Cooper's defective embryo culture media did Cooper recall multiple lots of its culture media, including a lot that ruined Plaintiffs' embryos.

8. Because of Cooper's actions, Plaintiffs' hopes of having children have been crushed.

## PARTIES

9. Plaintiff C.A. is, and at all relevant times was, a citizen of Vancouver, British Columbia, Canada.

10. Plaintiff C.B. is, and at all relevant times was, a citizen of Vancouver, British Columbia, Canada.

11.     Given the sensitive nature of their claims, Plaintiffs request this Court allow them to proceed under pseudonyms to ensure Cooper keep Plaintiffs' identity confidential throughout the pendency of the lawsuit and thereafter.[1]

12.     Defendant COOPERSURGICAL, INC. ("Cooper") is a Delaware corporation, with its principal place of business in Trumbull, Connecticut. Defendant primarily manufactures medical devices for women's healthcare and fertility markets. At all relevant times herein, Defendant CooperSurgical was and is authorized to conduct business within the State of Connecticut and in British Columbia, Canada, and distributed its products, including the above-referenced embryo culture media, throughout the State of Connecticut and Canada, including British Columbia.

## JURISDICTION AND VENUE

13.     Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over the entire action by virtue of the fact that this is a civil action between citizens of a foreign state and this state and wherein the matter in controversy exceeds $75,000, exclusive of interest and costs.

14.     This Court has personal jurisdiction over Defendant.  Defendant is, and at all relevant times herein was, a citizen of and/or authorized to conduct business in the State of Connecticut and/or conducted such business within the State of Connecticut, including the actions, dealings, and/or omissions that caused or contributed to the harm giving rise to this action.

---

[1]     Plaintiffs' counsel will apprise Defendant of Plaintiffs' true names. Plaintiffs will file a motion for protective order, if requested by the Court or Defendant, to proceed under pseudonyms.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Cooper is a resident of this judicial district and a substantial part of the events and/or omissions giving rise to the claims in this action occurred in this judicial district.

## GENERAL FACTUAL ALLEGATIONS

### General Background of Assisted Reproductive Technology ("ART")

16.     ART involves fertility-related treatments in which human eggs or embryos are manipulated. The most common type of ART is in vitro fertilization ("IVF").

17.     During the IVF process, eggs are extracted from a woman and fertilized in a laboratory with sperm to create a viable embryo. Later in the IVF process, the embryo is transplanted into a uterus.

18.     The process of extracting human eggs from a woman is lengthy, typically requiring significant medication, including injections, frequent bloodwork to monitor hormone levels, monitoring through ultrasound and other scans to check the development of the eggs, and a surgical procedure to collect the eggs.

19.     Following the collection of the eggs, sperm is mixed with the eggs in a laboratory to create embryos.  Embryo culture media is used to create an environment in which to cultivate embryos.

20.     Many people, including Plaintiffs, elect to have their embryos stored for a period of time before the embryo is transferred to a woman's uterus.

21.     There can be many reasons for undergoing these expensive and extensive procedures well in advance of the embryo implantation, including that human eggs are a limited and precious resource. A woman has a limited number of eggs at birth, and this supply diminishes as part of the natural aging process.  Moreover, not only does the quantity of a

woman's eggs diminish with time, but so does a woman's egg quality, with miscarriages and chromosomal abnormalities occurring more frequently for women who are older at the time of a natural conception and pregnancy. The most determinative factor in IVF success is the woman's age when her eggs were extracted.

### The Importance of Embryo Culture Media in IVF

22.    Embryo culture media plays a pivotal role in the IVF process. The culture media serves as the essential substance in which an egg is immersed, typically in a petri dish, when it is fertilized and during its development in the lab.

23.    Embryo culture media for embryo development is designed to meet the needs of fertilized eggs and embryos by providing, among other things, necessary sources of energy, nutrients, and pH levels based on the specific developmental stage of the embryo. Embryo culture media is composed of a salt solution with the addition of other components, such as magnesium, carbohydrates (pyruvate, lactate, and glucose), and amino acids. These vital - components of the embryo culture media are essential for an embryo's successful growth.

24.    Magnesium is required for embryonic development and is a key element to repair mutations during cell division. Insufficient magnesium levels in embryo culture media can cause embryo growth to arrest and inhibit DNA repair.

25.    After egg retrieval, the embryologist fertilizes the eggs with sperm, and then the fertilized eggs develop to the blastocyst stage in the culture media.  This typically occurs over a period of five to seven days.

26.    Embryologists closely monitor cell development during this time period to determine if the embryos are developing as intended. The count begins on "Day 0," or the day the eggs are fertilized with sperm. On Day 1, the embryologists typically assess the eggs to see

5

which have successfully been fertilized and become embryos. Between Day 1 and Day 3, the embryos typically begin cell division in the "cleavage stage." By Day 4, the embryos typically enter the "morula stage," characterized by a compacted mass of cells. By Day 5, the embryo typically re-expands to the blastocyst stage, in which the embryo shows two distinct groups of cells: an inner cell mass and an outer globe of cells.

27.    All embryo development is slightly different, and some embryos may develop later than others; but typically, fertilized eggs that do not develop to blastocyst by the seventh day are not considered viable. The embryo culture media supports and protects the developing embryos in these critical early stages, just as a woman's body would do during natural conception.

28.    The resulting embryos then can be transferred to the uterus, where a fetus can form.

<u>**Cooper's Embryo Culture Media**</u>

29.    Cooper marketed and promoted its embryo culture media for use as the essential culture media in which fertility clinics can fertilize eggs and create the embryos that would become the future children of fertility clients like Plaintiffs.

30.    Cooper further marketed and represented that its embryo culture media is rigorously tested to ensure it is the highest quality embryo culture media available.

31.    Moreover, Cooper marketed and promoted that all its embryo culture media was properly tested, and, thus, could be relied upon and/or posed no harm for use with growing human embryos.

6

32.     Specifically, Cooper claimed "[q]uality is our cornerstone," stating its "products undergo thorough quality testing before being released, to ensure consistent quality for your piece of mind."

33.     Cooper manufactured, marketed, distributed, and/or sold its embryo culture media while promoting that its embryo culture media was tested by superior methods to ensure that the culture media was not missing key ingredients.

34.     Cooper knew that sterility and quality control are crucial to ensure that developing embryos in culture media are not harmed. Improperly created culture media (*e.g.*, culture media with missing ingredients) may kill the embryos they contact.

35.     Improperly created culture media can cause DNA fragmentation, non-viable embryos, poor-quality embryos, early pregnancy loss, preterm birth, birth defects, and/or predisposition to serious medical conditions.

36.     Improperly created culture media can increase financial costs to both the patient and the clinics.

37.     Cooper knew or should have known that some of its embryo culture media was not adequately manufactured and adequately tested, and thus posed a severe risk to the human embryos with which the culture media would come into contact.

38.     Moreover, as a manufacturer of products used in ART, Cooper knew or should have known that any resulting harm or destruction to an aspiring parent's embryos caused by one of their products would undoubtedly result in significant emotional distress and mental anguish, as well as physical manifestations of such distress and anguish.

**Cooper's Recall of Its Embryo Culture Media**

39.     On or about December 5, 2023, Cooper issued a recall of several lots of its embryo culture media, including LGGG Lots 231020-018741, 231020-018742, and 231020-018743 (the "Recalled Embryo Culture Lots.")

40.     However, on information and belief, Cooper received numerous complaints from fertility clinics regarding impaired embryo development well prior to issuing the recall.

41.     Had Cooper issued a recall of its Recalled Embryo Culture Lots upon receiving the above-referenced numerous complaints—as it should have done—Plaintiffs' embryos would not have been ruined by Cooper's defective embryo culture media.

42.     Moreover, on information and belief, Cooper intentionally did not immediately disseminate notice of the Recalled Embryo Culture Lots publicly or throughout the IVF community.

43.     The recall notice states "CooperSurgical has become aware of a sudden increase in complaints regarding the aforementioned lots of this product," acknowledged that the "risk to health is impaired embryo development prior to the blastocyst stage," and directed clinics who purchased the product to quarantine and return it.

44.     According to regulatory authorities, Cooper issued the recalls because the Recalled Embryo Culture Lots lacked the critical component of magnesium.

45.     On information and belief, Cooper previously has manufactured and sold numerous products used in ART, including other culture media, that were defective and sometimes recalled.

**Cooper Knew or Should Have Known That the Recalled Embryo Culture Lots**

**Posed an Unreasonable Risk to Viable Embryos**

46.     As a manufacturer and distributor of numerous ART products, including culture media, Cooper knew that improperly manufactured/assembled culture media could kill human embryos upon contact, have significant and adverse consequences for the survival outcome of embryos created through ART, and/or harm the children that result from those embryos. Accordingly, Cooper knew it was vitally important that its culture media was properly assembled, composed, tested and/or inspected prior to the distribution of such media.

47.     Despite this, Cooper failed to properly inspect, assemble, compose, and test its culture media, including the Recalled Embryo Culture Lots. Cooper knowingly put its culture media into the market when it knew or should have known that the Recalled Embryo Culture Lots posed a substantial and unacceptable risk to human embryos, including Plaintiffs' embryos.

48.     As a manufacturer of numerous products for use in ART, Cooper knew that people go to extraordinary lengths to obtain and use viable human embryos. Cooper knew that people place an extremely high value on their embryos, expend substantial emotional and financial resources for their embryos, and expect that great care will be taken to preserve and protect the embryos in order to avoid irreparable harm to their embryos.

49.     Cooper's conduct was despicable and was carried out by Cooper with a willful and conscious disregard of the rights and/or safety of others, including putting Cooper's profits over the safety of others, including Plaintiffs.  Cooper's conduct subjected Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights.  Moreover, as discussed herein, Cooper's conduct amounted to a deceit and/or concealment of material fact(s) known to Cooper

with the intention on the part of Cooper to deprive individuals of property and/or legal rights and/or otherwise cause injury.

**Plaintiffs' Embryos Were Destroyed by the Recalled Embryo Culture Lots**

50.     Plaintiffs utilized ART to try to fulfill their dream of having biological children. To that end, Plaintiffs entrusted a fertility clinic to create their embryos in order to have a child.

51.     On or about November 27, 2023, Plaintiff C.A. underwent an egg-retrieval procedure that yielded approximately eighteen viable eggs. From those, embryos were created using C.A.'s eggs and Plaintiff C.B.'s sperm and placed in the defective embryo culture media. However, this process resulted in far fewer embryos than Plaintiffs expected: only two (which were very low quality).

52.     Plaintiffs would have had many more usable embryos were it not for the defect in Cooper's Recalled Embryo Culture Lots. The Recalled Embryo Culture Lots killed Plaintiffs' embryos.

53.     Plaintiffs' embryos were placed in the defective embryo culture media *after Cooper had already received numerous complaints* regarding the ultimately recalled lots from various clinics.

54.     By not issuing a recall earlier—after receiving complaints about its defective culture media, but before that culture media came into contact with Plaintiffs' embryos— Cooper exhibited a conscious indifference to others (including Plaintiffs), a disregard of a known or highly probable risk of severe harm to others (including Plaintiffs), and a readiness to expose others (including Plaintiffs) to a severe risk of harm. Cooper's shocking misconduct in this regard was done for the purpose of benefiting itself.

10

55.     Plaintiffs and their clinic were shocked and devastated that out of 18 fertilized eggs, only two "made it" through the embryo development process, and those two were low quality (making it far less likely than normal that those embryos would result in a pregnancy and live birth).

56.     These results were particularly distressful for Plaintiffs because Plaintiff C.A. had severe health consequences following her egg retrieval, including ovarian hyperstimulation syndrome (OHSS), which required long-term hospitalization. Plaintiff C.A. put her health at significant risk in order for Plaintiffs to have a child through the IVF cycle that was ruined by Defendant's defective embryo culture media.

57.     To compound Plaintiffs' devastation at the results of their cycle, Plaintiffs' fertility doctor later told Plaintiffs that culture media from the Recalled Embryo Culture Lots was used on Plaintiffs' developing embryos. Plaintiffs then knew the tragic reason their cycle yielded so few embryos.

58.     Further, Plaintiff C.A. is unable to undergo any further cycles due to the health consequences from the November 2023 cycle.

59.     Desperate to try to have children, Plaintiffs made an excruciating decision to attempt to transfer one of their surviving embryos that was compromised by the Recalled Embryo Culture Lots to a surrogate. To Plaintiffs, this decision felt like it was made under emotional and medical duress, as it was their only option—albeit a long shot given the low quality of the surviving embryos. This transfer was unsuccessful, which compounded Plaintiffs' emotional and mental pain and distress.

60.     In sum, Plaintiffs' IVF cycle was completely ruined as a result of the Recalled Embryo Culture Lots and Plaintiff C.A.'s health consequences were for nothing.

11

61.    The loss of Plaintiffs' embryos has resulted in significant and daily emotional distress and mental anguish, including physical manifestations of such distress and anguish. Plaintiffs continue to experience substantial and persistent trauma, manifesting as recurring nightmares, sleep disturbance, avoidance behavior, and having to take medical leave due to the distress and anguish.

62.    Plaintiffs are devastated. They will not have children as a result of Cooper's conduct.

## FIRST CAUSE OF ACTION

### STRICT PRODUCTS LIABILITY—MANUFACTURING DEFECT

63.    Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

64.    At all times relevant herein, Cooper manufactured, distributed, and/or sold embryo culture media, including the Recalled Embryo Culture Lots, to be used with developing human embryos.

65.    At the time the Recalled Embryo Culture Lots left Cooper's control, the Recalled Embryo Culture Lots contained a manufacturing defect, such that they differed from Cooper's intended result and industry standards. This deviation included, but was not necessarily limited to, a lack of magnesium and difference(s) in the chemical structure or composition of the Recalled Embryo Culture Lots, such that the Recalled Embryo Culture Lots posed a fatal harm to developing human embryos upon their contact with human embryos, in addition to the other serious risks discussed in this Complaint. The Recalled Embryo Culture Lots did not substantially change in condition after they left Cooper's possession or control.

12

66.     The embryo culture media from the Recalled Embryo Culture Lots was used as instructed, and it came into contact with Plaintiffs' embryos, which resulted in the tragic destruction or compromise of Plaintiffs' embryos. When they left Cooper's control, the Recalled Embryo Culture Lots were in a condition that rendered them unsafe for normal or anticipated handling, because they lacked key ingredients that are necessary for safe embryonic development. In other words, when used as instructed, the Recalled Embryo Culture Lots had the opposite effect: They inhibited embryo development.

67.     The Recalled Embryo Culture Lots were also dangerous beyond what would be contemplated by the ordinary consumer because an ordinary consumer or user would not assume that a product that claims to foster embryo development would be manufactured in a way that would actually harm developing embryos and inhibit safe embryonic development.

68.     Indeed, but for the use of the Recalled Embryo Culture Lots on Plaintiffs' embryos, all (or at a minimum, substantially more) of their embryos would have developed into usable embryos and been viable for Plaintiffs to use in a transfer. Instead, as a result of Cooper's conduct, all of Plaintiffs' embryos were compromised or completely destroyed.

69.     The defect(s) in the culture media in the Recalled Embryo Culture Lots was a substantial factor in causing Plaintiffs' harm.

70.     Cooper acted with a conscious disregard for the safety of consumers and/or users of its embryo culture media, including Plaintiffs, because, without limitation, Cooper was aware of the dangerous consequences of not properly or adequately testing its embryo culture media lots (including specifically the Recalled Embryo Culture Lots), when it knew or should have known the culture media (specifically, the Recalled Embryo Culture Lots) did not meet the product specifications, were not safe, and posed a serious risk to irreplaceable human embryos.

Knowing this, Cooper  failed to recall the Recalled Embryo Culture Lots before the culture media came into contact with Plaintiffs' embryos.

## SECOND CAUSE OF ACTION

## STRICT PRODUCTS LIABILITY—FAILURE TO WARN

71.     Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

72.     Cooper manufactured, distributed, and/or sold embryo culture media to be used with human embryos, including the Recalled Embryo Culture Lots, and/or caused such culture media to be manufactured, distributed, and/or sold.

73.     The Recalled Embryo Culture Lots had risks, including but not limited to killing and/or harming embryos, that were known and/or knowable in light of the generally accepted scientific knowledge at the time of manufacture, distribution and/or sale.

74.     The risks of contaminated or defective culture media, including the Recalled Embryo Culture Lots, presented a substantial and unreasonable danger, including but not limited to destruction of viable embryos, when such culture media was used as intended and/or in a reasonably foreseeable manner.

75.     Despite Cooper's awareness that its culture media, including the Recalled Embryo Culture Lots, was defective and contained an unacceptably increased danger to embryos, Cooper failed to warn consumers, including but not limited to Plaintiffs and Plaintiffs' fertility providers who purchased the culture media—prior to use on Plaintiffs' embryos—that the media had not been properly and/or sufficiently tested or inspected, contained compounds and/or a combination

14

of compounds that were harmful to human embryos, in addition to the other serious risks discussed in this Complaint.

76.    Neither Plaintiffs nor their fertility providers knew or would have known or recognized the risks of the Recalled Embryo Culture Lots when they were used.

77.    As a direct and proximate result of Cooper's failure to adequately warn of the dangerous effects of the Recalled Embryo Culture Lots, Plaintiffs were harmed as described herein, including but not limited to the destruction of their embryos and significant emotional distress.

78.    The lack of sufficient warnings was a substantial factor in causing Plaintiffs' harm and damages. Contaminated or harmful embryo culture media would not have been used with Plaintiffs' embryos if Cooper had provided sufficient warning(s) in advance.

79.    Indeed, but for the use of the Recalled Embryo Culture Lots on Plaintiffs' embryos, all (or at a minimum, substantially more) of their embryos would have been viable for Plaintiffs to use in a transfer. Instead, as a result of Cooper's conduct, all of Plaintiffs' embryos were compromised or completely destroyed.

80.    Cooper acted with a conscious disregard for the safety of consumers and/or users of its embryo culture media, including Plaintiffs, because, without limitation, Cooper was aware of the dangerous consequences of not properly or adequately testing or inspecting its embryo culture media (including specifically the Recalled Embryo Culture Lots), when Cooper knew or should have known the culture media (specifically, the Recalled Embryo Culture Lots) were not safe and posed a serious risk to irreplaceable human embryos, eggs, and genetic material. Knowing this, Cooper failed to recall or otherwise remove from the market the Recalled Embryo Culture Lots before the culture media came into contact with Plaintiffs' embryos.

**THIRD CAUSE OF ACTION**

**NEGLIGENCE**

81.     Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

82.     Cooper manufactured, distributed, and/or sold embryo culture media for use with human embryos, including the Recalled Embryo Culture Lots, or caused such media to be manufactured, and/or sold.

83.     As a manufacturer of culture media for use with human embryos, Cooper owed duties, including but not limited to Plaintiffs, to manufacture, inspect, compose, and/or test its culture media, including the Recalled Embryo Culture Lots, such that its media was not hazardous when used on human embryos and/or was not missing vital ingredients.

84.     Cooper breached these duties and were negligent in its manufacture, inspection, composition, and/or testing of its culture media, including the Recalled Embryo Culture Lots.

85.     Indeed, Cooper recklessly failed to adequately test or inspect the Recalled Embryo Culture Lots prior to their distribution, despite Cooper's knowledge of the dangerous consequences of not adequately testing or inspecting its embryo culture and of the extreme value that people, such as Plaintiffs, place on developing embryos.

86.     As a direct and proximate result of Cooper's negligent acts and/or omissions, including but not limited to their reckless failure to properly or adequately test its culture media (including the Recalled Embryo Culture Lots), as well as promoting and marketing its culture media as superior, effective, properly tested, and safe for use on human embryos despite its knowledge of the contamination, defective manufacture, and/or failure(s) to adequately warn of

16

the dangerous and otherwise harmful effects of the Recalled Embryo Culture Lots, Plaintiffs were harmed as described herein, including but not limited to the compromise and/or destruction of their embryos.

87.     These negligent acts and/or omissions were a substantial factor in causing Plaintiffs' harm and damages. Indeed, but for the use of the Recalled Embryo Culture Lots on Plaintiffs' embryos, all (or at a minimum, substantially more) of their embryos would have been viable for Plaintiffs to use in a transfer. Instead, as a result of Cooper's conduct, all of Plaintiffs' embryos were compromised or completely destroyed.

88.     Cooper acted with a conscious disregard for the safety of consumers and/or users of its embryo culture media, including Plaintiffs, because, without limitation, Cooper was aware of the dangerous consequences of not properly or adequately testing or inspecting its embryo culture media (including specifically the Recalled Embryo Culture Lots), when Cooper knew or should have known the culture media (specifically, the Recalled Embryo Culture Lots) were not safe and posed a serious risk to irreplaceable human embryos, eggs, and genetic material. Knowing this, Cooper and failed to recall or otherwise remove from the market the Recalled Embryo Culture Lots before the media came into contact with Plaintiffs' embryos.

## FOURTH CAUSE OF ACTION

### GROSS NEGLIGENCE

89.     Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

17

90.     Cooper manufactured, distributed, and/or sold embryo culture media for use with human embryos, including the Recalled Embryo Culture Lots, or caused such media to be manufactured and/or sold.

91.     As a manufacturer of culture media for use with human embryos, Cooper owed duties, including but not limited to Plaintiffs, to manufacture, inspect, compose, and/or test its culture media, including the Recalled Embryo Culture Lots, such that its media was not hazardous when used on human embryos and/or was not missing vital ingredients.

92.     Cooper breached these duties and were grossly negligent in its manufacture, inspection, composition, and/or testing of its culture media, including the Recalled Embryo Culture Lots.

93.     Indeed, Cooper recklessly failed to adequately test or inspect the Recalled Embryo Culture Lots prior to their distribution, despite Cooper's knowledge of the dangerous consequences of not adequately testing or inspecting its embryo culture and of the extreme value that people, such as Plaintiffs, place on developing embryos.

94.     Further, Cooper recklessly failed to appropriately and safely manufacture the Recalled Embryo Culture Lots, despite Cooper's knowledge of the dangerous consequences of manufacturing, distributing, and selling an embryo culture media that was missing key ingredients, and that a culture media missing key ingredients would destroy or otherwise harm people's precious embryos, such as Plaintiffs' embryos.

95.     Moreover, on information and belief, before Plaintiffs' embryos were placed in one of the Recalled Embryo Culture Lots, Cooper had already received complaints from other clinics regarding a significant spike in adverse effects to developing embryos placed in that culture media. Yet Cooper knowingly failed to notify fertility clinics or clinicians, including

Plaintiffs' fertility clinic, immediately of these adverse events to ensure that these consequences did not happen to additional people's embryos, despite Cooper's knowledge of the extreme value that people place on developing embryos. In essence, Cooper was on notice that people, like Plaintiffs, would be harmed and their embryos destroyed or damaged, yet Cooper purposefully decided to hide this.

96. As a direct and proximate result of Cooper's negligent acts and/or omissions, including but not limited to its reckless failure to properly or adequately test its culture media (including the Recalled Embryo Culture Lots), as well as promoting and marketing its culture media as superior, effective, properly tested, and safe for use on human embryos despite its knowledge of the contamination, defective manufacture, and/or failure(s) to adequately warn of the dangerous and otherwise harmful effects of the Recalled Embryo Culture Lots, Plaintiffs were harmed as described herein, including but not limited to the destruction of their embryos and significant emotional distress.

97. These negligent acts and/or omissions were a substantial factor in causing Plaintiffs' harm and damages. Indeed, but for the use of the Recalled Embryo Culture Lots on Plaintiffs' embryos, all (or at a minimum, substantially more) of their embryos would have been viable for Plaintiffs to use in a transfer. Instead, as a result of Cooper's conduct, all of Plaintiffs' embryos were compromised or completely destroyed.

98. Cooper acted with a conscious disregard for the safety of consumers and/or users of its embryo culture media, including Plaintiffs, because, without limitation, Cooper was aware of the dangerous consequences of not properly or adequately testing or inspecting its embryo culture media (including specifically the Recalled Embryo Culture Lots), when Cooper knew or should have known the culture media (specifically, the Recalled Embryo Culture Lots) were not

19

safe and posed a serious risk to irreplaceable human embryos, eggs, and genetic material. Knowing this, Cooper failed to recall or otherwise remove from the market the Recalled Embryo Culture Lots before the culture media came into contact with Plaintiffs' embryos.

## FIFTH CAUSE OF ACTION

### NEGLIGENT FAILURE TO RECALL

99.    Plaintiffs re-allege and incorporate by reference herein each and every allegation contained in all other paragraphs in this Complaint as though fully set forth in this cause of action.

100.    At all times relevant herein, Cooper manufactured, distributed, and/or sold culture media for use with human embryos, including the Recalled Embryo Culture Media Lots.

101.    As manufacturers and distributors of culture media for use with human embryos, Cooper owed duties, including but not limited to Plaintiffs, to manufacture, inspect, compose, and/or test its culture media, including the Recalled Embryo Culture Lots, such that its culture media was not hazardous when used on human embryos and was not missing vital component materials such that the media were harmful or destructive.  Further, Cooper had an ongoing duty following its manufacture, distribution, and/or sale of its culture media, including the Recalled Embryo Culture Lots, to inform purchasers, consumers, and/or others who used its culture media that the media were harmful to human embryos, and to immediately recall and/or remove such media from the market to prevent harm.

102.    Cooper breached these duties and acted negligently by failing to recall the Recalled Embryo Culture Media Lots earlier, including before such culture media came into contact with Plaintiffs' embryos.

20

103.    For a significant period of time before it issued the recall of its Recalled Embryo Culture Lots, Cooper knew and/or should have known that, when used as intended, its Recalled Embryo Culture Media Lots were not properly or adequately composed or assembled, were not properly or adequately tested prior to distribution, and posed an unreasonable increased risk to embryos, in addition to the other risks noted in this Complaint.

104.    Indeed, before the Recalled Embryo Culture Lots came in contact with Plaintiffs' embryos, Cooper had received complaints from other clinics regarding impaired embryo development with use of the Recalled Embryo Culture Lots. Had Cooper timely issued a recall and informed Plaintiffs' fertility clinic, the Recalled Embryo Culture Lots would not have been used on Plaintiffs' embryos and all (or at a minimum, substantially more) of their embryos would have been viable for Plaintiffs to use in a transfer. Instead, as a result of Cooper's conduct, all of Plaintiffs' embryos were compromised or completely destroyed.

105.    Cooper knew, and/or reasonably should have known that the defects in its culture media, including the Recalled Embryo Culture Lots, posed a substantial risk of serious injury to the embryos in which the culture media came into contact with and/or was used.

106.    Cooper knew and/or reasonably should have known that it had failed to properly or adequately test, inspect, or assemble the composite materials in its Recalled Embryo Culture Lots before distributing and/or selling and/or causing such culture media from entering the market.

107.    A reasonable manufacturer, distributor, and/or seller in the same or similar circumstances would have recalled the embryo culture media and issued a notice to purchasers, consumers, and/or users—prior to the media coming into contact with Plaintiffs' embryos— rather than continuing to allow the media to be used, sold, distributed, and/or manufactured,

21

thereby obfuscating the true risks of its culture media, specifically the Recalled Embryo Culture Lots, to human embryos.

108.    Despite the fact that it knew or should have known that the Recalled Embryo Culture Lots were defective and posed an unacceptable risk to embryos, Cooper failed to recall its culture media in a timely or prudent manner.

109.    Cooper acted with a conscious disregard for the safety of consumers and/or users of its embryo culture media, including Plaintiffs, because, without limitation, Cooper was aware of the dangerous consequences of not properly or adequately testing or inspecting its embryo culture media (including specifically the Recalled Embryo Culture Lots), when it knew or should have known the culture media (specifically, the Recalled Embryo Culture Lots) were not safe and posed a serious risk to irreplaceable human embryos, eggs, and genetic material, in addition to the other risks discussed in this Complaint.  Knowing this, Cooper failed to recall or otherwise remove from the market the Recalled Embryo Culture Lots before the culture media came into contact with Plaintiffs' embryos.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment against Defendant as follows:

1) For past, present, and future non-economic damages in an amount to be determined at the time of trial;

2) For past, present, and future economic damages in an amount to be determined at the time of trial;

3) For exemplary damages, in an amount to be determined at trial;

4) For costs of suit herein;

5) For pre- and post-judgement interest as allowed by law; and

22

6) For such other and further relief as the Court may deem just and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs demand a jury trial on all causes of action and claims with respect to which it has a right to jury trial.

DATED:  June 23, 2025

HURWITZ SAGARIN SLOSSBERG & KNUFF, LLC

By:  */s/ David A. Slossberg*
David A. Slossberg (ct409595)
Julie V. Pinette (ct30573)
135 Broad Street
Milford, CT  06460
Telephone: (203) 877-8000
Email: DSlossberg@hssklaw.com
        JPinette@hssklaw.com

PEIFFER WOLF CARR KANE CONWAY & WISE, LLP
Adam B. Wolf (PHV forthcoming)
Melisa A. Rosadini-Knott (PHV forthcoming)
3435 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90010
Telephone: (415) 766-3545
Email: awolf@peifferwolf.com
        mrosadini@peifferwolf.com

*Attorneys for Plaintiffs*